Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | P. MICHAEL MAHONEY | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 50228 | **DATE** | 6/24/2003 |
| **CASE TITLE** | JOEL ALLAN JOHNSON vs. JO ANNE B. BARNHART | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
 ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the attached memorandum opinion and order: Plaintiff's motion for summary judgment is denied and defendant's motion for summary judgment is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| ✓ | Notices mailed by judge's staff. | JUN 24 2003 date docketed |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | docketing deputy initials |
| | Copy to judge/magistrate judge. | 6/24/2003 date mailed notice |
| GG courtroom deputy's initials | | GG mailing deputy initials |
| | Date/time received in central Clerk's Office | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| JOEL ALLAN JOHNSON, ) | |
| ) | |
| Plaintiff, ) | Case No. 02 C 50228 |
| ) | |
| v. ) | Magistrate Judge |
| ) | P. Michael Mahoney |
| JO ANNE B. BARNHART, ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Joel Allan Johnson, ("Plaintiff"), seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner"). *See* 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for Disability Insurance Benefits ("DIB") pursuant to Title XVI of the Social Security Act (the "Act"). 42 U.S.C. §1381(a). This matter is before the Magistrate Judge pursuant to consents filed by both parties on January 31, 2003. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

### I. BACKGROUND

Plaintiff filed for DIB on August 31, 1993, alleging disability on June 30, 1992. (Tr. 23). Plaintiff was awarded disability benefits on November 23, 1993 due to an affective disorder. (Tr. 26). Plaintiff's case was reviewed for continuing eligibility and he was notified that his disability ceased on March 1, 1998 and that his benefits would stop at the end of May of 1998, based upon medical improvement related to his ability to work. (Tr. 41). Plaintiff appealed this determination, which was affirmed on reconsideration on January 15, 1999. (Tr. 103). Plaintiff then filed a timely request for a hearing before an Administrative Law Judge ("ALJ"). (Tr. 116). Plaintiff appeared,

without counsel, before an ALJ on June 16, 1999. (Tr. 284). In a decision dated April 27, 2000, the ALJ found that Plaintiff was not entitled to DIB. (Tr. 19). On May 1, 2000, Plaintiff requested a review of the ALJ's decision by the Appeals Council. (Tr. 4). On April 5, 2002, the Appeals Council denied Plaintiff's request for review. (Tr. 4).

## II. FACTS

Plaintiff was born on August 25, 1954 and was 45 years old at the time of his June 1999 hearing. (Tr. 23). According to Plaintiff, he graduated high school and completed one year of college. (Tr. 293). Plaintiff's marriage of June 1, 1991 ended by divorce on June 2, 1992. (Tr. 24).

Plaintiff's past work experience includes work as an ambulance driver, a credit manager for a television rental company, a material handler for an auto parts factory, and an assembler and shipper of hydraulic cylinders. (Tr. 139). In his most recent job, Plaintiff assembled and lifted hydraulic cylinders, weighing approximately seventy pounds. (Tr. 296). Plaintiff stopped working in June of 1992 following a "heart attack" and has not returned to work since that time. (*Id.*).

Following his "heart attack" and subsequent divorce, Plaintiff began receiving disability for an affective disorder. (Tr. 26). During that time, he was living in a transient hotel and eating at missions. (Tr. 29). His functional assessment indicated that Plaintiff was grossly depressed and had repeated panic attacks. (*Id.*). Further, his ability to carry out detailed instruction, to maintain concentration, and to sustain an ordinary routine was found limited. (Tr. 27).

In 1998, Plaintiff's disability benefits ceased due to medical improvement of his mental condition related to his ability to do work. (Tr. 39). In the continuing disability assessment, Plaintiff's evaluation demonstrated that he had no medically determinable mental impairment. (Tr. 50).

In the request for reconsideration, Plaintiff claimed that he was unable to work because of two "heart attacks." (Tr. 62). However, Plaintiff's Functional Capacity Assessment conducted by state agency physician, Dr. Bernet, indicated that there was no evidence of heart malfunction. (Tr. 49). A subsequent assessment conducted by Dr. Dow, another state agency physician, indicated that although Plaintiff was found to have a history of alcohol abuse and hepatitis, there was no medical evidence of a severe impairment, thus his request for reconsideration was denied. (Tr. 67).

At the June 1999 hearing, Plaintiff complained of constant chest pain that radiated from his neck all the way across his chest and that had been consistent for the past six months. (Tr. 304). Plaintiff also mentioned gastric concerns, specifically a reoccurring bleeding ulcer for which he is taking medication. (Tr. 303). He claimed that his blood pressure was too low, and that at times he felt sick to his stomach as if he were going to faint. (Tr. 300). Plaintiff denied any problems with depression, and has not been treated for a mental impairment since 1993. (Tr. 305).

According to Plaintiff, on a normal day he spends his time chasing golf balls to sell and doing yard work for his mother. (Tr. 239). He does all of his own chores including cooking, washing dishes, sweeping, mopping, and vacuuming. (Tr. 307). Plaintiff does his own shopping, pays his own bills, and has joined a bowling league. (Tr. 308). Plaintiff also testified to doing a lot of walking, as much as four miles in one day. (Tr. 309). He spends most of his time reading, watching television or movies, and visiting with friends. (Tr. 306). He also testified that he had not consumed alcohol in more than one year. (*Id.*).

III. **MEDICAL HISTORY**

Plaintiff had been treated by Dr. Kelly at the Woodside Medical Clinic from January 1991 through April 1993 for various conditions, including severe anxiety, elevated blood pressure, chest

3

pain, hepatitis, and alcoholism. (Tr. 177-86). According to her medical report, Dr. Kelly had prescribed Plaintiff with Zestril and Tigan as treatment for his high blood pressure. (Tr. 136). On August 14, 1993, Plaintiff was admitted to the emergency room of the Swedish American Hospital with complaints of chest pain after collapsing on the street. (Tr. 137). The electrocardiogram ("ECG") was found normal and Plaintiff was advised to continue his medication, avoid alcohol, and follow-up with Dr. Kelly. (Tr. 190).

In October of 1993, family physician, Dr. Levich, completed a Report of Incapacity for the Illinois Department of Pubic Aid. (Tr. 194). On this report, Dr. Levich found that Plaintiff had full capacity for walking, bending, standing, stopping, sitting, turning, pulling, fine and gross manipulations, and that he could repeatedly lift up to 10 pounds during an eight-hour day. (*Id.*). Dr. Levich also found that Plaintiff had full capacity for the activities of daily living, and that he had a ten to twenty percent reduced capacity for social functioning and concentration, persistence, and pace. (*Id.*).

Plaintiff's earliest mental examination was conducted by Dr. Hoffman, a consultative psychiatrist, on October 18, 1993. (Tr. 206). Upon meeting with Plaintiff, Dr. Hoffman observed that Plaintiff was "slightly disheveled in appearance" and was "rather melancholic." (Tr. 207). In his report, Dr. Hoffman found that in addition to being depressed because of his recent divorce, Plaintiff had poor concentration and memory. (*Id.*). Dr. Hoffman diagnosed Plaintiff with Axis I dysthymia, which he described as severe and untreated, and adjustment disorder with depressed mood. (*Id.*) Dr. Hoffman determined that Plaintiff was reacting to a series of losses, including his recent divorce. (*Id.*). Essentially, he found that Plaintiff felt "very alone and without any support." (*Id.*).

4

Dr. Kuester, a state agency consultant, reviewed this diagnosis on November 10, 1993. (Tr. 30). On that date, Dr. Kuester diagnosed Plaintiff with an affective disorder and a substance addition disorder. (*Id.*). Dr. Kuester found that Plaintiff had difficulty in maintaining social functioning, and that his daily activities were limited by his mental state. (Tr. 37). Specifically, Dr. Kuester found that Plaintiff lacked sufficient concentration and had difficulty completing tasks in a timely manner. (*Id.*). Plaintiff could not maintain concentration and had a limited ability to carry out simple instructions, therefore, he could not meet the basic mental demands of unskilled work. (Tr. 27.). At that time, Plaintiff was found eligible for disability benefits due to an affective disorder.

Plaintiff continued treatment at Crusader Clinic from March 1996 through the present time for medical problems, including hepatitis, gastritis, headaches, alcoholism, and mild tendonitis of the biceps. (Tr. 228). At the Crusader Clinic, he was treated by Dr. Bane who prescribed Zantac and requested to see Plaintiff every ninety days. (*Id.*).

Dr. Hoffman once again evaluated Plaintiff on November 24, 1997 in connection with his continuing disability evaluation. (Tr. 222). Dr. Hoffman observed that Plaintiff was "neat in appearance" and was "friendly." (*Id.*). In his report, Dr. Hoffman found that Plaintiff's concentration and attention were intact, and that his mood was normal. Dr. Hoffman diagnosed Plaintiff as having no psychiatric disorder. (*Id.*).

On January 14, 1998, Dr. Spriegel affirmed Dr. Hoffman's November 1997 finding that Plaintiff had no medically determinable psychological impairment. (Tr. 50). Dr. Spriegel found that Plaintiff's affective disorder was absent and that Plaintiff no longer experienced such difficulty in social functioning and completing tasks. (Tr. 57).

On February 10, 1998, state agency physician, Dr. Bernet, examined Plaintiff and administered

5

a Residual Functional Capacity Assessment. (Tr. 42). At that time, Plaintiff was diagnosed with mild tendonitis of the left arm and a history of chronic hepatitis B. (Tr. 39). Dr. Bernet also found that Plaintiff had no medically determinable psychiatric impairment. (Tr. 49). In regards to his physical ability, Dr. Bernet found that Plaintiff had no physical limitations. (Tr. 43). He found that Plaintiff could carry up to fifty pounds, could stand, walk, or sit about six hours in a normal workday with standard breaks, and had an unlimited ability to push and pull. (*Id.*). In regards to Plaintiff's heart condition, Dr. Bernet found that his heart beat was at a regular rhythm and his cardiac status was stable. (Tr. 49).

On April 8, 1998, state agency physician, Dr. Dow, reviewed Plaintiff's medical records and established that there was no evidence that Plaintiff had a severe physical impairment. (Tr. 67). Dr. Dow also determined that there was no evidence to support Plaintiff's allegations of a heart attack. (*Id.*). Further, Dr, Dow found that Plaintiff's liver function had returned to normal, and that he was no longer suffering from chronic hepatitis. (*Id.*).

Shortly thereafter, Dr. MacLean confirmed that Plaintiff had no severe medical impairments. (Tr. 74). While he acknowledged Plaintiff's history of hepatitis, alcohol abuse, and previous heart attacks, Dr. MacLean made no diagnosis for Plaintiff. (Tr. 75). Because the Plaintiff's psychiatric condition was considered improved as of March 1998, his disability benefits were discontinued in May of that year.

On August 13, 1998, Plaintiff arrived at the Crusader Clinic with complaints of right-sided neck and upper extremity pain. (Tr. 270). He denied any injury to his neck, or heavy lifting with his right arm. (*Id.*). Upon examination, Plaintiff was found capable of moving his neck and upper extremities in all directions without limitation. (*Id.*). However, he did complain of experiencing pain

6

starting just below the head and extending all the way down his right hand. (*Id.*). Plaintiff reported that he experienced no numbness or weakness associated with this pain. *(Id.)*. He was prescribed Disalcid for his neck pain and was to report back to the clinic in one week's time. (*Id.*).

On August 27, 1998, Plaintiff reported that his condition had not improved and was referred to physical therapy. (Tr. 260). Plaintiff was seen a total of twelve times during which time he received treatment, including moist heat, soft tissue massage, cervical mobilization, posture education, and therapeutic exercise. (Tr. 257.) He was discharged in November of 1998 after continuous no-shows or cancellations. (*Id.*). No diagnosis was made before his discharge. (*Id.*).

In December of 1998, Plaintiff arrived at the Crusader Clinic reporting that the physical therapy had not been of help, and that he was experiencing lower chest and left chest discomfort. (Tr. 273). Dr. Bane found that Plaintiff's neck was tender in the right trapezius, but that he had good range of motion in his neck. (*Id.*). Dr. Bane also found that Plaintiff's pulses, lungs, and heart were normal. (*Id.*). In an attempt to relieve the possible effects of the prescribed Disalcid on Plaintiff's discomfort, Dr Bane asked him to take Tylenol on an as needed basis and to try Zostrix cream. (*Id.*).

On March 8, 1999, Plaintiff returned to Crusader Clinic with complaints of stomach pain that radiated through his chest. (Tr. 273). Plaintiff had been diagnosed with and treated for a pylori ulcer in 1992, and in 1999 was diagnosed with a peptic ulcer, for which he was to take Pepto-Bismol (Tr. 275). A month later, Plaintiff continued to complain of abdominal discomfort for which Dr. Yontz proscribed Prilosec. (Tr. 276). Dr. Yontz cautioned Plaintiff to refrain from drinking alcohol and treated him with tetracycline, Flagyl, Pepto-Bismol, and Pepcid b.i.d. (Tr. 277). Before the hearing in June of 1999, Plaintiff continued to complain of abdominal pain. (*Id.*).

7

## IV. STANDARD OF REVIEW

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the ALJ." *Meredith v. Bowen*, 833 F.2d 650, 653 (7th Cir. 1987) (citation omitted); *see also Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the Commissioner's delegate the ALJ)." *Richardson v. Perales*, 402 U.S. 389, 399-400 (1971), *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Arbogast v. Bowen*, 860 F.2d 1400, 1403 (7th Cir. 1988). "Substantial evidence" is "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Walker v. Bowen*, 834 F.2d 635, 643 (7th Cir. 1987), *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it

8

is "patently wrong" or if it finds no support in the record. *Kelley v. Sullivan*, 890 F.2d 961, 965 (7th Cir. 1989), *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994), *Yousif v. Chater*, 901 F. Supp. 1377, 1384 (N.D. Ill. 1995).

## V. **FRAMEWORK FOR DECISION**

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied his application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382(c)(3)(C). *See Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[1] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is

---

[1]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. See 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

9

medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a),(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[2] A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain

---

[2]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. See, e.g., 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1565; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala,* 22 F.3d 687, 691-92 (7th

Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

## VI. ANALYSIS

This Court will proceed through the five step analysis in order.

A. Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One Analysis the ALJ found that Plaintiff had not engaged in any substantial gainful activity at any time relevant to his decision issued on June 16, 1999. (Tr. 284).

Under ordinary circumstances, a claimant is engaged in substantial gainful activity if the claimant's earnings averaged more than seven hundred and eighty dollars per month for years after January 1, 2001. (20 C.F.R. § 1574 (b) (2) Table 1, as modified by 65 FR 82905, December 29, 2000).

The finding of the ALJ as to Step One of the Analysis is not challenged by either party and this Court finds no reason to disturb this finding. The ALJ's determination as to Step One of the Analysis is affirmed.

B. Step Two: Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis, the ALJ found that Plaintiff suffers from severe impairments. The ALJ found that the medical condition for which Plaintiff was granted disability, specifically his psychiatric condition, medically improved in relation to Plaintiff's ability to work. (Tr. 1). Therefore, the ALJ determined that Plaintiff's psychiatric condition no longer qualifies as a disabling impairment. (Tr. 12).

Although the ALJ determined that Plaintiff no longer suffers from a severe mental

12

impairment, the ALJ found that Plaintiff has another impairment or combination of impairments that is severe. Specifically, the ALJ found that Plaintiff suffers from tendonitis and torticollis and bleeding ulcers. (Tr. 17). Also, although Plaintiff alleges that he is disabled due to a cardiac dysfunction, the ALJ found that it does not constitute a severe impairment because there is no documentation of a heart condition. (Tr. 13).

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. This finding is not challenged by either party and the court finds no reason to disturb it. The ALJ's finding as to Step Two of the Analysis is affirmed.

C.  Step Three: Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three the ALJ determined that Plaintiff's impairment do not meet or equal any impairment in Appendix 1 to Subpart P of Regulations number 4. (Tr. 14). The ALJ found that Plaintiff has been diagnosed with tendonitis and torticollis, which are severe impairments under the Act. (Tr. 13). However, because they do not limit Plaintiff's daily activities, they do not satisfy the requirements of the musculoskeletal systems in Section 1.00(A) of the Listing of Impairments, Appendix 1, Subpart P, Part 404 of the Regulations. (*Id.*). [3]

Further, the Plaintiff alleges that he suffers from cardiac dysfunction, which could be a severe impairment under the Social Security Act. However, because this condition is not documented by

---

[3] Section 1.00(A) provides "loss of function may be due to amputation or deformity. Pain may be an important factor in causing functional loss, but it must be associated with relevant abnormal signs or laboratory findings. Evaluations of musculoskeletal impairments should be supported where applicable by detailed descriptions of the joints, including ranges of motion, condition of the musculature, sensory or reflex changes, circulatory deficits, and X-ray abnormalities." 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 1.

13

medical evidence, it does not meet the requirements of the cardiovascular systems in Section 4.00(A) of the Listing Impairments, Appendix 1, Subpart P, Part 404 of the Regulations.[4]

Substantial evidence exists to support the ALJ's finding and this Court finds no reason to disturb it. Therefore, the ALJ's determination as to Step Three of the Analysis is affirmed. (Tr. 16)

D.    Step Four: Is the claimant capable of performing work which the claimant performed in the past?

In performing the analysis for Step Four, the ALJ determined that there was insufficient information to determine whether Plaintiff is capable of performing his past relevant work. (Tr. 18). This Court agrees with the ALJ's finding, but also notes that Plaintiff could have been found capable of performing past work due to his own admission.

At the June 1999 hearing, Plaintiff testified to being capable of performing past work despite his medical impairments. At one point Plaintiff had worked as a shipper and assembler of hydraulic parts for which he was required to constantly lift 70 pounds throughout an eight-hour workday. (Tr. 296). When asked by the ALJ what part of the job he could no longer do, Plaintiff responded that he could still do it. (*Id.*). He stated that he had not gone back to work, not because of a physical impairment, but because none of his previous employers would hire him. (*Id.*). The evidence suggests that although Plaintiff suffers from various physical ailments, the ALJ could have found that

---

[4]Section 4.00(A) provides that "the listings in this section describe impairments resulting from cardiovascular disease based on symptoms, physical signs, laboratory test abnormalities, and response to a regimen of therapy prescribed by a treating source. A longitudinal clinical record covering a period of not less than 3 months of observations and therapy is usually necessary for the assessment of severity and expected duration of cardiovascular impairment, unless the claim can be decided favorably on the basis of the current evidence. All relevant evidence must be considered in assessing disability." 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 1.

14

he was not sufficiently limited in his capacity to do previous work.

The ALJ's determination as to Step Four of the Analysis is affirmed. (Tr. 16).

E.   Step Five: Is the claimant capable of performing any work existing in substantial numbers in the national economy?

In determining whether Plaintiff is capable of performing work in the national economy, the ALJ had to evaluate whether the mental condition for which Plaintiff was receiving disability had sufficiently improved. The ALJ also had to determine if Plaintiff's other impairments were disabling.

To decide whether Plaintiff's mental condition improved to such an extent that Plaintiff would be capable of performing work, the ALJ had to determine whether there was a medical improvement in Plaintiff's mental condition, and whether that improvement was related to his ability to work. (Tr. 12).

The ALJ found that between 1993 and 1998, Plaintiff experienced improvement in his medical condition that affected his ability to work. In 1993, Dr Hoffman diagnosed Plaintiff with severe and untreated dysthymia, and an adjustment disorder with depressed mood. (Tr. 207). Evaluations from other physicians determined that Plaintiff had a reduced mental work capacity and was deficient in his ability to maintain social skills and concentration. (Tr. 37.). However, in November of 1997, Hoffman's psychiatric examination of Plaintiff reflected a normal mental state with no abnormality in mood, memory, or concentration. (Tr. 222). Thus, the ALJ stated, "insofar as a clear dimunition in symptomology has been established, medical improvement has occurred." (*Id.*).

The ALJ found that the improvement in Plaintiff's mental state affected his ability to work, thus he should no longer be entitled to disability benefits for his mental condition. (Tr. 15). Plaintiff's psychiatric evaluations showed that after 1998, he no longer had a mental impairment and

15

no longer experienced difficulty in maintaining concentration, following instructions, or completing tasks. Disability benefits were originally granted to Plaintiff due to his inability to be instructed at work, which was no longer present in his later evaluation. Substantial evidence supports the ALJ's determination that Plaintiff has the ability to work due to medical improvement, and his psychiatric condition is no longer disabling.

To determine whether Plaintiff should receive disability for his other impairments, the ALJ had to consider whether they were sufficiently disabling so as to prevent Plaintiff from performing work. Ultimately, the ALJ did not find the claimant's allegations of disabling symptoms and functional limitations sufficiently credible. (Tr. 18). The ALJ did not find claimant's allegations credible because there was no medical evidence of Plaintiff's heart dysfunction and his daily activities are inconsistent with the severity of his symptoms. (Tr. 17). The ALJ held that Plaintiff's Residual Functional Capacity ("RFC") allows him to perform the full range of light work, and that there exist a significant number of jobs in the national economy that he can perform. The ALJ determined that Plaintiff's complaints regarding his inability to work were inconsistent with the medical evidence regarding his disabling symptoms and limitations. In expressing his scepticism over Plaintiff's condition, the ALJ stated, "it is clear that the claimant's complaints are out of proportion with the pathology shown on examination or testing." (Tr. 15). At the hearing, Plaintiff complained of chest pain that is crushing in nature, throbbing headaches, and neck pain which is constant. (Tr. 16). However, none of the medical reports suggest that Plaintiff has a serious heart condition.

In December of 1998 and again in March of 1999, Dr. Bane found that Plaintiff's pulse and heart were normal, and did not prescribe treatment for his alleged heart condition. (Tr. 273). Further, Plaintiff testified to doing all of his own chores, shopping, and even does yard work for his mother.

(Tr. 307). He also testified to walking up to four miles in one day. Therefore, Plaintiff's extensive daily activities and medical reports are inconsistent with his allegations of pain and disability.

The ALJ found that Plaintiff is not disabled considering the Plaintiff's RFC, age, education, and work experience. The ALJ found, "as of March 1, 1998, the claimant retains the residual functional capacity to lift/carry up to fifty pounds occasionally, and twenty-five pounds frequently; and sit, stand, walk, respectively with normal breaks up to six hours each in an eight-hour day." (Tr. 15.). Further, because Plaintiff was forty-three years old at the time that his benefits were ceased, he was considered a younger individual. (Tr. 18.). Plaintiff also has a high school education, thus his RFC suggests that he is able to work. (*Id.*). Substantial evidence exists to support the ALJ's findings.

The ALJ's determination as to Step Five of the Analysis is affirmed. (Tr. 17).

## VII. CONCLUSION

For the above stated reasons, the court finds that the ALJ's findings at each step of the sequential analysis are supported by substantial evidence. Therefore, Plaintiff's motion for summary judgment is denied. Defendant's motion for summary judgment is granted.

**ENTER:**

_____

**P. MICHAEL MAHONEY, MAGISTRATE JUDGE**
**UNITED STATES DISTRICT COURT**

DATE: 6/24/03